1

HONORABLE ROSANNA MALOUF PETERSON

Norma Rodriguez
2   Rodriguez & Associates, P.S.
7502 West Deschutes Place
3   Kennewick, Washington 99336
P: (509) 783-5551
4   F: (509) 736-1151

5

6

7               IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF WASHINGTON
8                        AT RICHLAND

9   THE ESTATE OF CHRISTOPHER            NO.:   CV-11-5136-RMP
    VILLARREAL, by and through VICTOR
10  VILLARREAL, in his capacity as Personal          DECLARATION OF D.P. VAN
    Representative of the Estate; NANCY MASON,        BLARICOM
    in her capacity as general guardian of C.V. and
11  D.V. two surviving minor children of Christopher
    Villarreal; TIFFANY YOUNG, in her capacity as
12  general guardian of N.Y., a minor child of
    Christopher Villarreal; SIMON VILLARREAL,
13  Christopher Villarreal's father; and ROSA
    VILLARREAL, Christopher Villarreal's mother,
14
                    Plaintiffs,
15  vs.

16  LEE COOPER, in his capacity as a Police Officer
    for the City of Kennewick Police Department, and
17  as an individual; THE CITY OF KENNEWICK,
    WASHINGTON, a municipal organization; and
18  KENNEWICK POLICE DEPARTMENT, an
    agency of the Defendant THE CITY OF
19  KENNEWICK.

20                  Defendants.

21  I, D.P. Van Blaricom, a person over the age of 18, being first duly sworn upon oath under penalty of

22  perjury under the laws of the United States, deposes and says:

23      1.  I am person over the age of 18 years and am a citizen of the United States

24

25  DECLARATION
    Page 1 of 2
26

27

28

2. I was hired as an expert by the Plaintiffs as law enforcement training and tactics expert and am competent to testify as to my findings at trial.

3. Based on the documents available to me I prepared a written opinion as to the actions taken by Defendant Cooper on September 14, 2009, as those actions relate to standard and accepted law enforcement training and tactics. A true and correct copy of that opinion is attached as **Exhibit 1.**

I hereby declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

SIGNED in _BELLEVUE_ , _WA_ this _21 ST_ day of December, 2012.

D.P. Van Blaricom

DECLARATION
Page 2 of 2

EXHIBIT 1

## D.P. VAN BLARICOM, Inc.
### MPA, FBI-NA, CHIEF of POLICE (Ret)
### *POLICE PRACTICES EXPERT*
#### 835 – 91ST lane N.E.
#### Bellevue, Washington 98004-4811
#### (425) 453-0082 FAX 453-3263 E-Mail dvbinc@aol.com

## Federal Rule 26 (a) (2) (B)
## REPORT OF PLAINTIFFS' POLICE PRACTICES EXPERT
## September 26, 2012 – Amended September 29, December 12 and 21, 2012

1.   My name is D.P. Van Blaricom and I make this report on behalf of plaintiffs in the U.S. District of Eastern Washington CV-11-5136 -RMP filing of ***Villarreal, et al. v. City of Kennewick, et al.*** under my file 11-1653.

2.   My law enforcement career has spanned over fifty-five years of active employment to date:

    a.   Twenty-nine years of continuous police service, during which I was the Chief of Police of Bellevue, Washington for the last eleven of those years;

    b.   Thereafter, I have been engaged as a police practices consultant for an additional twenty-six years.

3.   A detailed statement of my qualifications, experience, training and a list of all of my publications are attached hereto as Exhibit "A".  Both my fee schedule for services and a list of my deposition and trial testimony for the preceding four years are attached hereto as Exhibits "B" and "C" respectively.  My areas of expertise in the police arts and sciences include but are not limited to: police administration, policies, practices, procedures and standards of care; police use of force; less-lethal alternatives to deadly force in both equipment and tactics; internal investigation and discipline.  As a police practices expert, I have testified in state and federal courts for both plaintiffs and defendants throughout the United States.

4.   Rodriguez and Associates retained my services on June 6, 2011 to review the facts and circumstances of the fatal officer-involved shooting (OIS) of Christopher Villarreal (decedent) by City of Kennewick Police Department (KPD) Officer Lee Cooper (shooter) on September 14, 2009 (Monday) at approximately 1332 hours (1:32 PM).  I have discussed the matter with plaintiffs' counsel and a preliminary report was prepared in reliance upon my review of the following documents:

    a.   Benton County Sheriff's Office (BCSO) reports 09-14778:

        1)   Statements:

            a)   Shooter,

            b)   Detective Brian Pochert,

            c)   Witness Jody White,

        2)   Diagrams of scene;

    b.   Washington State Patrol (WSP) crime scene report 209-001142;

    c.   Kennewick Fire Department (KFD) report 2009-05093;

    d.  Benton County Coroner report C-699-09;

    e.  KPD reports:

        1)  Internal Affairs (IA) Investigation 09-007,

        2)  Firearms Review Board 09-007;

    f.  U.S. Attorney's correspondence of September 10, 2010;

    g.  Answers to Plaintiff's First Interrogatories;

    h.  KPD Policies:

        1)  Chapter 41 Patrol,

        2)  Chapter 61 Traffic;

    i.  National Law Enforcement Policy Center model policies:

        1)  001 – Use of Force,

        2)  007 – Investigation of Employee Misconduct,

        3)  014 – Vehicular Pursuit,

        4)  037 – Motor Vehicle Stops,

        5)  067 – Reporting Use of Force,

        6)  070 – Dealing with the Mentally Ill,

        7)  076 – Officer-Involved Shootings.

    5.  I have reviewed the following additional documents, since submitting my preliminary report on September 26, 2012:

    j.  Declarations:

        1)  Shooter,

        2)  BCSO Deputy Larry Smith;

    k.  Shooter's training record;

    l.  Expert Bill Skelton's reconstruction analysis;

    m.  Depositions:

        1)  Shooter,

        2)  Detective Brian Pochert;

    n.  Defendants' Expert Disclosures (2):

        1)  Joseph Fountain (police practices),

        2)  Thomas Aveni (police practices),

        3)  Matthew Noedel (ballistics),

        4)  Patrick Sadler (accident reconstruction).

    6.  My deposition was taken on December 18, 2012 and I have since reviewed the following additional documents:

    o.  Chief Kenneth Hohenberg's deposition,

    p.  Photographs of shooter's motorcycle and decedent's vehicle at rest;

    q.  Statements of eyewitness Kathleen Kennison:

        1)  Undated handwritten with sketch,

        2)  September 14, 2009 interview transcript,

        3)  September 17, 2009 interview transcript.

    7.  It is my customary practice to evaluate the objective reasonableness of police conduct on a case-by-case basis from the perspective of a former Chief of Police, career law enforcement officer and nationally recognized police practices expert (see Exhibit "A").  In conducting that evaluation I apply:

a. My training and experience as a police officer, who was required to apprehend drivers of fleeing vehicles in the performance of my law enforcement duties;

b. My training and experience as a police supervisor, who was assigned to conduct internal investigations;

c. My training and experience as a police supervisor and commander, who was assigned to train police officers on patrol procedures, use of force and firearms;

d. My training and experience as a police supervisor and commander, who had to evaluate the performance of my subordinate police officers;

e. My training and experience as a chief of police, who had to hire, train, assign, administer and, as may be necessary, discipline and/or terminate police officers;

f. My training and experience as a chief of police, who had to develop and administer policies and procedures for directing police officers under my command;

g. My training and experience as a chief of police, who had to review internal investigations and make the final administrative decision on whether to sustain or not sustain allegations of misconduct;

h. My service as an elected city council member, after my retirement as chief of police;

i. My continuing training, as is supplemented by an ongoing review of professional publications, that addresses contemporary developments in my areas of expertise (see Exhibit "A" Continuing Training);

j. Additionally, I have served as a police practices expert in 1,700+ matters of police-related litigation (see Exhibit "A"), wherein I have testified at deposition or trial in hundreds of cases (see Exhibit "C") on whether or not a particular fact pattern was objectively reasonable under the totality of circumstances;

8. My method of forensic analysis is to compare the specific facts of each case that I review to my training, experience (see Exhibit "A") and recognized professional standards of care:

a. State and federal appellate court decisions, such as *Graham v. Connor* and similar citations;

b. National Law Enforcement Policy Center model policies and similar publications.

9. My use of certain terms (i.e. – *"negligent"*, *"reasonable suspicion"*, *"probable cause"*, *"objectively reasonable"*, *"reckless disregard"*, *"deliberately indifferent"*, *"duty"*, *"ratified"*, *"unconstitutional"*, etc.) merely reflects my training and experience, in applying reasonable standards of care to police officers' conduct, and does not presume or imply a statement of any legal opinion.

10. Similarly, my use of certain terms (i.e. – *"cyanosis"*, *"petechiae"*, *"apnic"*, *"excited delirium"*, *"carotid"*, *"hyoid"*, *"asphyxia"*, etc.) merely reflects my training and experience in reviewing triage and/or autopsy reports and does not presume or imply a statement of any medical opinion.

11.  This incident involved use of force, which I have hereafter briefly discussed for the fact finder's enhanced understanding of actual police practice.

a. Police officers, police trainers and police practice experts may not express legal opinions on use of force but they are trained to know and understand when and how much force may be used in the lawful performance of a police duty;

b. Both justification and limitation on police use of force have been clearly established by the United States Supreme Court, which supercedes any contradictory state statutes or local police policies:

   1) *Tennessee v. Garner*, 471 U.S. 1, 105 S. Ct. (1985),
   2) *Graham v. Connor*, 490 U.S. 386, 109 S. Ct. (1989);

c. These seminal use of force decisions are further interpreted by the United States Circuit Courts (1st through 11th), thereby further clarifying legal standards that will be individually applied within each Circuit;

d. American police officers **MUST COMPLY** (emphasis supplied) with these legal standards;

e. From a police practices perspective, the fundamental issues in any use of force are:

   1) Was force reasonably necessary under the totality of circumstances?
   2) If force was reasonably necessary, was the amount or degree of force used reasonable under the totality of circumstances?

f. Specific factors that police officers are trained to evaluate, in determining the amount or degree of force to be used, are:

   1) Use of deadly force:
      a) Is there probable cause to believe that a criminal suspect poses an immediate threat of death or serious physical injury to the officers or others?
      b) And where feasible, has some warning been given?
   2) All uses of force:
      a) What is the severity of the crime at issue?
      b) Does the suspect pose an immediate threat to the safety of the officers or others?
      c) Is the suspect actively resisting arrest or attempting to flee?
   3) Situational factors also affect decision making:
      a) The use of force must be judged from the perspective of a reasonable officer on the scene and not from the 20/20 vision of hindsight,
      b) Allowance must be made for the fact that officers are often forced to make split-second judgments, about the amount of force that is necessary in a particular situation, in circumstances that are tense, uncertain and rapidly evolving
      c) The officer's underlying intent or motivation is irrelevant;

    4) In all cases, **THE TYPE AND AMOUNT OF FORCE USED MUST BE OBJECTIVELY REASONABLE UNDER THE TOTALITY OF CIRCUMSTANCES** (emphasis supplied);

g. There are varying methods of applying force that may be justifiably used by an officer in response to a reasonably perceived threat and are, in ascending order, as follows:

    1) Officer presence,

    2) Voice command,

    3) Escort or soft hand hold,

    4) Pain compliance:

        a) Hands on,

        b) Oleoresin capsicum (OC pepper) aerosol spray,

        c) TASER (electronic control weapon),

        d) Baton,

        e) Impact projectiles,

    5) K-9 bite,

    6) Firearm;

h. An officer is not required to progress sequentially through the afore described *"steps"*, however, and may immediately respond with the appropriate level of force to overcome whatever level of resistance is being encountered on a case by case basis;

i. My further analysis of this incident will be within the context of the foregoing explanation of police practice for use of force in the United States.

12.  My specific training to review officer-involved shootings, includes the following:

a. U.S. Marine Corps small arms repairman (MOS 2111);

b. U.S. Marine Corps *"expert rifleman"*;

c. Death investigation by the King County, WA Coroner;

d. Police and medical investigation of death by the Dade County, FL Medical Examiner;

e. International Association of Chiefs of Police (IACP):

    1) Management Controls on Police Use of Deadly Force,

    2) Investigation of Excessive Force Incidents,

    3) Active Shooter;

f. Deadly Force and the Police Officer by Northwestern University;

g. Lethal and Less-Lethal Force by the Americans for Effective Law Enforcement;

h. Shooting reconstruction by Northwestern University's Center for Public Safety;

i. American Academy of Forensic Sciences:

    1) Shooting Reconstruction,

    2) Recognition, Detection and Significance of Gunshot Residue,

    3) Gunshot Wounds Theory and Practice;

j. Forensics Certificate from the University of Washington;

13.  Additional experience, as a career police officer, in the prevention and investigation of shootings, included:

    a.  Police firearms instructor for over ten years;

    b.  Fired a rare *"possible"* score on the FBI practical pistol course (PPC);

    c.  Detective commander in shooting investigations, including a freeway sniper who shot two victims in motor vehicles;

    d.  Incident commander in the deployment of SWAT units during critical incidents;

    e.  Designed prototype of Detonics MkVII .45 ACP semi-auto pistol.

14.  As a police practices expert retained in over 1,500 matters, for both plaintiffs and defense, I have:

    a.  Reviewed 370 OIS to date;

    b.  Served as the prevailing party's expert in the following OIS appellate decisions:

        1)  9th Cir. *Reed v. Douglas County, OR* 1989,

        2)  1st Cir. *Roy v. City of Lewiston, ME* 1994,

        3)  ID S. Ct. *Kessler v. Payette County, ID* 1997,

        4)  WA App. *Lee v. City of Spokane, WA* 2000,

        5)  9th Cir. *Haugen v. City of Puyallup, WA* 2003,

        6)  9th Cir. *Wilkins v. City of Oakland, CA* 2003,

        7)  9th Cir. *Herrera v. City of Las Vegas, NV* 2004,

        8)  8th Cir. *Craighead v. City of St. Paul, MN* 2005,

        9)  9th Cir. & US S. Ct. *Lehman v. Robinson,* 2007/2009,

        10) 9th Cir. *Kiles v. City of North Las Vegas, NV* 2008,

        11) 9th Cir. *Tubar v. City of Kent, WA* 2008,

        12) AZ App. *Celaya v. City of Phoenix, AZ* 2008,

        13) 9th Cir. *Bryan v. City of Las Vegas, NV* 2009,

        14) 6th Cir. *Jefferson v. City of Flint, MI* 2010,

        15) 6th Cir. *Bletz v. Ionia County, MI* 2011,

        16) 9th Cir. *Glenn v. Washington County, OR* 2011;

    c.  Lectured on Investigation of Officer-Involved Shootings at the Henry C. Lee Institute of Forensic Science;

    d.  Co-authored *INVESTIGATION and PREVENTION of OFFICER-INVOLVED DEATHS* © 2011 CRC Press and includes chapters on:

        1)  Reducing and Preventing Deaths by Training and Policy Guidance;

        2)  Officer-Involved Shootings,

        3)  *"Suicide-by-Cop"*;

        4)  Emotionally Disturbed Persons (EDP);

    e.  Testified in state and federal courts throughout the United States in OIS-related litigation;

    f.  Served to reconstruct OIS for my recommendation on whether or not the shooting officer should be criminally charged:

        1)  Rapides Parish, LA District Attorney, wherein I recommended a criminal charge and the shooter was charged and convicted,

2) City and County of San Francisco District Attorney, wherein I recommended no criminal charge and the shooter was not charged.

15.  Based upon my training, experience and a careful evaluation of the totality of circumstances in this matter, it is my considered professional opinion that the following facts appear to be supported by the record:

    a. Decedent:

        1) Hispanic male of 39 years,

        2) Height 5 feet 7 inches and weight 208 pounds,

        3) Toxicology 15.4 mg/L butalbital - intoxicated,

        4) Gunshot wounds (GSW) x 4:

            a) Perforating left upper arm/shoulder, left to right, slightly back to front and horizontal,

            b) Penetrating left upper arm/deltoid, left to right, slightly back to front and level,

            c) Penetrating left upper back, slightly left to right, back to front and slightly downward – probable fatal shot,

            d) Perforating little right finger;

    b. Shooter was assigned to a motorcycle as a traffic enforcement officer;

    c. Dispatch alerted shooter to decedent's vehicle from a *"reckless driver"* report to 911;

    d. When shooter first encountered decedent's vehicle approaching from the opposite direction, he perceived that decedent *"steered the car across the center line towards me on my motorcycle";*

    e. Shooter took evasive action and thereafter initiated a vehicular pursuit of decedent, in which he was joined by Detective Pochert driving an unmarked vehicle;

    f. An initial attempt to apprehend decedent, while he was stopped for traffic, failed and, after he pointed over the top of his vehicle at a parking lot, decedent drove therein and stopped;

    g. Shooter and Detective Pochert followed and stopped behind decedent's vehicle:

        1) Shooter stopped his motorcycle approximately 45 feet back (by shooter's estimate and distances estimated by other witnesses vary widely), turned off his ignition and put down his kickstand,

        2) Detective Pochert stopped his unmarked vehicle to the left rear of shooter's motorcycle;

    h. Decedent's vehicle slowly reversed at a speed of 2 to 4.5 mph;

    i. Shooter began firing at decedent, as he dismounted his motorcycle, and continued firing thereafter for a total of 9 x .40 caliber;

    j. Detective Pochert did not fire;

    k. The left rear bumper of decedent's vehicle came to rest against the front wheel of shooter's motorcycle, with minimal, if any, impact:

        1) *"The only damage to the motorcycle appeared minor, the front fender was slightly shifted to the right",*

        2) *"The motorcycle was still standing on is* (sic) *side kickstand",*

3) Photographs confirm the foregoing, except that they show no damage to shooter's motorcycle, and further illustrate that shooter had more than adequate space to safely maneuver to his left, as he indisputably did;

l.  The trajectories of shooter's shots into decedent' vehicle are consistent with shooter moving to his left and out of that vehicle's rearward path;

m. Decedent was fatally wounded.

16.  Based upon my training, experience and a careful evaluation of the totality of circumstances in this matter, it is my considered professional opinion that decedent did not pose a significant threat of death or serious physical injury to either the shooter or others at the time he was shot.  In reaching that conclusion, I was specifically mindful of the following information from the record:

a.  All of the information previously described herein;

b.  Motor vehicles can only proceed forward or backward and, accordingly, officers are trained to neither position themselves in front of nor at the rear of an occupied suspect vehicle with the engine running;

c.  Shooter testified in his deposition:

1) *"Dismounting without putting the kick stand down and dropping the motorcycle on either side"* is an option when *"somebody is running at you with a gun or a knife and they are within a couple feet, you simply don't have time to put the stand down"* (page 30 lines 12-13 and page 31 lines 12-15):

a) Accordingly, he had been *"taught"* to *"drop the bike"* under such circumstances, but obviously had *"time to put the stand down"*,

b) Why the quicker option of simply *"dropping the motorcycle"* was not exercised, in the interests of both time and safety under the circumstances of this OIS, is unexplained,

2) Contrary to previously described policies that prohibit shooting at vehicles in supposed self-defense, shooter testified:

a) His *"training"* was to *"disable* (shoot) *the driver"* (page 35 lines 16-21),

b) Such *"training"* included a mistaken expectation that the *"disabled driver"* is *"no longer to take on the internationality* (sic) *of pushing on the gas peddle and steering toward people"* (page 35 line 25 and page 36 lines 1-8),

3) If he was actually provided with any such dysfunctional training, it conflicts with the accepted police practice and a reasonable standard of care,

4) Shooter further clarified details of this OIS:

a) When decedent's *"brake lights were on"* and his vehicle *"was about to come to a complete stop, the reverse lights come* (sic) *on"* (page 92 lines 1-12),

        b) He does not know how fast decedent's vehicle was moving in reverse and he *"didn't hear the engine rev"* (page 103 lines 8-14),

        c) Instead of dismounting immediately, he took the additional time to *"pull my gun before I was off the motorcycle"* and fired his first shot around the *"right side"* of his windshield (page 102 lines 16-17, page 103 lines 21-23 and page 104 lines 6-8),

        d) After he dismounted his motorcycle and moved away, he *"continued firing"* (page 104 lines 19-20;

  d. Detective Pochert testified in his deposition:

    1) Shooter was firing at decedent before he had *"parked"* his own vehicle and he never saw him dismount his motorcycle (page 58 lines 7-12 and page 59 lines 18-19),

    2) He heard no impact between decedent's vehicle and shooter's motorcycle but *"they were touching"* (page 60 lines 19-25),

    3) His *"mindset"* was that shooter *"had previously told us that this guy tried to run him over"* and he *"was heightened"* (page 66 line 25 and page 67 lines 1-2),

    4) Although he did not shoot, he *"probably"* would have, instead of just moving out of the path of decedent's vehicle, because *"we are trained to end the threat"* (page 29 lines 2-16),

  e. Chief Hohenberg testified in his deposition and confirmed that his officers are actually trained, *"If the threat was a vehicle, yes, you stop to shoot* (sic) *the threat"* (page 28 lines 1-12);

  f. Expert Skelton's reconstruction analysis of this incident provided the following information:

    1) There was literally no damage to either decedent's vehicle or defendant officer's motorcycle and discovery has failed to produce an invoice for any motorcycle repair,

    2) Due to the configuration of the shift mechanism in decedent's vehicle (a Lexus), *"it is very possible"* decedent *"thought he had placed the shifter into Park but instead, stopped it in Reverse"*:

        a) I personally drive a Lexus and have experienced that same mistake, when parking, and only become aware that I am still in Reverse, when I cannot remove the ignition key,

        b) As another matter of personal experience, I once had a DUI attempt to disable my patrol vehicle by backing into it and there was absolutely no doubt what he was trying to do (i.e. – a rapid tire spinning acceleration in reverse until impact and significant damage to both vehicles),

    3) Given the time/distance parameters of this incident, shooter had between 13 and 7 seconds to move out of the path of decedent's vehicle, from the time it started backward until

closing the distance (again, witnesses' distance estimates vary widely) to shooter's motorcycle:

    4) Shooter' declaration states (page 6 lines 9-11):

        a) He is *"trained to exit* (dismount) *the motorcycle as quickly as possible in order to get to a safer position if need be"* and, as previously explained herein, shooter had already rested his motorcycle on the kickstand,

        b) Nevertheless, he inexplicably *"did not have sufficient time to disengage safely from my motorcycle";*

g. Since shooter had a minimum of 7 seconds to dismount his motorcycle, as decedent's vehicle moved slowly rearward at more probably than not *"a speed lower than 2.4 mph":*

    1) Shooter had more than sufficient time to dismount and move to a position of safety, just as he was trained;

    2) Shooter could have easily performed that familiar dismounting maneuver faster than he could draw/aim/fire at decedent and, moreover, also be repositioned safely out of the way,

    3) To the contrary, however, shooter remained astride his motorcycle, began firing at decedent, **STILL HAD TIME** to dismount and move out of the way but **CONTINUED FIRING** thereafter (emphases supplied);

h. Accordingly, shooter's actions were both tactically flawed and objectively unreasonable under the totality of these circumstances;

i. Additionally, It is well recognized that shooting at vehicles is neither necessary nor an effective means of defense;

j. For example:

    1) Seattle Police Department use of force policy:

        a) *"Firing at a moving vehicle can often only increase the risk of harm",*

        b) *"Firing at a moving vehicle will have very little impact on stopping the vehicle",*

        c) *"Disabling the driver will most likely only result in an uncontrolled vehicle",*

        d) *"An officer **SHALL NOT** discharge a firearm at the driver, occupants, or a moving vehicle unless deadly physical force is being used against the officer or another person by means **OTHER*** (emphasis supplied) *than a moving vehicle",*

        e) *"Officers shall not intentionally place themselves in a vehicle's path, to either the front or the rear"* and *"if they find themselves in danger from a moving vehicle, they shall attempt to move out of the way, if possible, rather than discharging their firearm",*

    2) Los Angeles Police Department use of force policy:

        a) *"Firearms **SHALL NOT*** (emphasis supplied) *be discharged at a moving vehicle unless a person in the*

vehicle is immediately threatening the officer or another person with deadly force **_OTHER_** (emphasis in original) *than the vehicle"*,

    b) *"An officer threatened by an oncoming vehicle shall move out of its path instead of discharging a firearm at it or any of its occupants"*,

3) National Law Enforcement Policy Center model policy on use of force:

    a) *"In many cases involving the discharge of firearms at a moving vehicle, it is based on the contention that the driver was intentionally attempting to run the officer down"*,

    b) *"One of the simplest alternatives to the use of a firearm in this instance is to move out of the vehicle's path and seek cover"*;

    c) Chief Hohenberg testified in his deposition, incidentally, that he *"normally"* uses just such *"model policies"* to develop KPD policies but apparently either missed or ignored the foregoing version (page 39 lines 20-22 and page 40 lines 6-9);

k. Obviously and from the indisputable facts developed in this OIS, shooter followed the foregoing good advice and had *"move*(d) *out of the vehicle's path"*;

l. Thereafter, however, he continued to *"fire a few more rounds"* at decedent, when he admittedly *"recognized that I was not directly behind the car anymore and, um, kind of out of immediate harm from the car and I wasn't as, umm, I didn't feel that I was in imminent danger of getting run over at that point because I was off to the side of the car and out of the turning radius of the car"*;

m. Accordingly and by shooters own admission, he had continued to fire at decedent **AFTER** he was aware that he no longer, **IF EVER** (emphases supplied), posed a significant threat of death or serious physical injury to shooter or others;

n. Eyewitness Kennison, who was a very close by observer on the immediate OIS scene and saw the entire incident transpire from start to finish, gave 2 transcribed interviews, wherein she stated:

1) Shooter had *"got off his bike at this point and **THEN** (emphasis supplied) the guy in the black car reversed into the motorcycle"*,

2) Shooter *"looked like he was trying to approach the car when it reversed into the motorcycle"*,

3) The shots were fired in 2 sequences and she *"thought it was 5 and then 3"*:

    a) That is reasonably consistent for an eyewitness hearing a total of 9 shots,

    b) And, is further consistent with shooter having continued to fire after being out of the vehicle's rearward path, as

established by both the bullet trajectories and defense expert Noedel's analysis, with which I agree;

    o.  In any event and as previously described, there are substantial issues of fact that can only be judicially resolved by the fact finder and are not subject to expert determination.

17.  Based upon my training, experience and a careful evaluation of the totality of circumstances in this matter, it is my considered professional opinion that the chief policy maker has knowingly ratified the previously described conduct of shooter, as being within the custom, policy and practice of the KPD. In reaching that conclusion I was specifically mindful of the following information from the record:

    a.  All of the information previously described herein;

    b.  Chief Ken Hohenberg is the chief policy maker of the KPD and has been made aware that shooter fatally shot decedent:

        1)  This OIS was investigated by KPD,

        2)  Thereafter, a KPD Firearms Review Board was conducted and officially concluded, *"Lethal force was reasonable under these circumstances"*,

        3)  Chief Hohenberg specifically *"concurred with their findings"* and has so advised shooter, who was neither retrained nor disciplined;

    c.  Chief Hohenberg testified in his deposition:

        1)  He is the *"appointing authority"* (page 18 lines 24-25),

        2)  He is not subject to *"oversight"* and he alone is *"accountable"* for the conduct of KPD officers (page 40 lines 14-15),

        3)  He *"supports"* shooter's actions, *"all"* of which *"were in accordance with KPD policy"* (page 54 lines 3-13);

    d.  Additionally, shooter has testified:

        1)  His *"actions were in accordance with his training"* (page 123 lines 15-18),

        2)  And, in retrospect, he would *"react the same way"* again (page 121 lines 19-22 and page 123 lines 19-22),

        3)  Chief Hohenberg has subsequently commended his shooting of decedent by telling him, *"Good job"* (page 120 line 25);

    e.  Accordingly, Chief Hohenberg has knowingly and specifically ratified shooter's conduct in this OIS as having been within the custom, policy and practice of the KPD.

18.  I have reviewed the report of defense expert Joseph Fountain and offer the following rebuttal thereto:

    a.  Mr. Fountain has advanced psychological opinions, for which he lists no qualifications:

        1)  Decedent *"was in manifest crisis"*,

        2)  Decedent *"was experiencing a severe behavioral crisis"*;

    b.  In spite of the critical time/distance factors previously described herein, Mr. Fountain has summarily concluded, *"Deadly force appears to be the only option to stop the deadly force threat faced"*:

1) No experienced police practices expert will reasonably conclude that any particular course of action was the *"**ONLY** (emphasis supplied) option"*,

2) And, as previously described herein, another and far safer *"option"* was for shooter to have simply moved out of the path of the slowly reversing vehicle,

3) Indeed and as also previously explained herein, that is exactly what Mr. Fountain's current Seattle Police Department employer **REQUIRES HIM TO DO** (emphasis supplied), under the same circumstances;

c.  In evaluating Mr. Fountain's credentials as a use of force expert, the fact finder may also wish to consider the following facts:

1) Mr. Fountain is a sergeant on the Seattle Police Department (SPD) and has previously reported that they *"regularly consult me* (him) *on questions of use of force"*,

2) The United States Department of Justice (DOJ) and U.S. Attorney recently conducted a civil rights investigation on use of force by Mr. Fountain's police employer and reported their following findings on December 16, 2011:

a) *"We find that SPD engages in a pattern or practice of using unnecessary or excessive force"*,

b) *"The pattern is the result of inadequate policies, supervision, discipline and training"*,

c)  *"Supervisors* (i.e. – sergeants) *often fail to meet their responsibility to provide oversight of the use of force"*,

d) *"When SPD officers use force, they do so in an unconstitutional manner 20% of the time"*,

e) *"Multiple SPD officers at a time use unnecessary or excessive force together"*,

f) *"SPD fails to properly monitor or investigate the use of force"* and *"to properly train its officers on the use of force"*,

g) *"SPD has tacitly allowed a pattern or practice of excessive use of force"*,

h) *"Supervisors* (i.e. – sergeants) *frequently neglect their duty to investigate the use of force"*,

i) *"We are aware of no case in which a first-line supervisor* (i.e. – sergeant) *was held accountable"*,

3) The City of Seattle  *"stipulated"* to the foregoing on July 27, 2012 and SPD is currently being actively *"monitored"* by the federal court for civil rights compliance;

d.  In summary, my review of Mr. Fountain's defense report has provided no information that would cause me to change or modify my earlier opinions.

19.  I have reviewed the report of defense expert Thomas Aveni and offer the following rebuttal thereto:

    a. Mr. Aveni has never served in a police supervisory or command position and accordingly:
        1) He has never been accountable for or exercised use of force policy making authority,
        2) He has never been accountable for or exercised use of force disciplinary authority
        3) He has never been accountable for or investigated use of force complaints against subordinate police officers;
    b. To the contrary, his *"training and experience"* to evaluate use of force has been strictly academic and his report reflects that limitation:
        1) Although *"prevalence of motor vehicles being used as instruments of deadly force against police officers has been extremely but (sic) difficult to measure"*, he nevertheless has relied upon a collection of unrelated anecdotal incidents to somehow justify this OIS,
        2) He thereafter simply declares this OIS to have been *"reasonable"*:
            a) He does not, however, explain the basis for that opinion, as required by federal rule 26 (a) (2) (B),
            b) Accordingly, his conclusion is based upon an impermissible *"because I say so"* or *"Ipse dixit"* standard;
    c. In summary, my review of Mr. Aveni's defense report has provided no information that would cause me to change or modify my earlier opinions.

20. I have reviewed the report of defense expert Matthew Noedel and offer the following rebuttal thereto:
    a. Mr. Noedel has analyzed the trajectories of the shots into decedent's vehicle and the probable positioning of shooter for those 3 groupings,
    b. Mr. Noedel's description of the foregoing is consistent with the physical evidence;
    c. Further, Mr. Noedel has confirmed my earlier opinion that shooter's last 4 shots were fired **AFTER** (emphasis supplied) he had moved out of the rearward path of decedent's vehicle.

21. I have reviewed the report of defense expert Patrick Sadler and offer the following rebuttal thereto:
    a. Mr. Sadler is an accident reconstructionist and, since I am not qualified to critique such conclusions, I will not attempt such an analysis;
    b. Nevertheless, Mr. Sadler does provide some useful insights:
        1) *"Inconsistencies are common"* in witnesses' descriptions of events and *"these individual accounts varied dramatically"*,
        2) Nevertheless, Mr. Sadler has attempted to rely upon those *"inconsistencies"* by merely *"averaging"* (not too scientific) witnesses' perceptions,

    3) Significantly, however, *"**ALL** (witnesses) speed accounts"* are consistent and *"have the Lexus* (decedent's vehicle) *backing **SLOWLY**"* (emphases supplied);

    4) *"There was **NO*** (emphasis supplied) physical *evidence"* to establish:

        a) Positions of decedent's vehicle and shooter's motorcycle before the OIS,

        b) Any *"impact speed"* between the vehicles;

c. Mr. Sadler attempts to go beyond his role of accident reconstructionist, however, and ended his report with gratuitous commentary on decedent's behavior and shooter's reaction thereto, which are police practice issues beyond his training and experience:

    1) Shooter *"was confronted with an obvious dangerous, life threatening situation"*,

    2) Decedent *"exhibited an erratic and dangerous driving behavior"*, including an earlier *"attempt to injure or kill"* shooter.

22.  I am prepared to testify to these opinions at deposition or trial, if called upon to do so

23.  When I am provided with further documentation for my review, I expect to have additional opinions.

/s/ *D.P. VAN BLARICOM*

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 28, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Robert Christie, WSBA 10895
Thomas Miller, WSBA 34473
CHRISTIE LAW GROUP, PLLC
2100 Westlake Avenue N., Suite 206
Seattle, Washington 98109
Phone: (509)-783-5551
Fax: (509) 736-1151
Attorneys for Plaintiffs

Richard Johnson
Delorie Johnson PLLC
917 Triple Crown Way, Suite 200
Yakima, WA 98908-2426
Phone: 509-469-6900
Fax: 509-454-6956

RODRIGUEZ & ASSOCIATES, P.S.

By _____/s/ Dennis Hanson_____
Dennis Hanson, WSBA 41655
Attorneys for Plaintiffs
7502 West Deschutes Place
Kennewick, Washington 99336
Telephone: (509) 783-5551
Fax: (509) 736-1151
Email:dhanson@rodriguezlawwa.com